UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JOSEPH MUNDY,                             )
                                          )
              Mundy,                      )    No.   08 C 1576
                                          )
        vs.                               )
                                          )
                                          )
LIFE INSURANCE COMPANY OF NORTH AMERICA,) 
In its capacity as Administrator of the )
Yellow Roadway Corporation Long-Term      )
Disability Benefits Plan,                 )
YELLOW ROADWAY CORPORATION LONG-TERM       )
DISABILITY BENEFITS PLAN,                 )
YELLOW TRANSPORTATION, INC.,              )
                                          )
              Defendants.                 )

**MUNDY'S REPLY TO DEFENDANTS' RESPONSE TO MOTION FOR LIMITED
DISCOVERY TO SUPPLEMENT THE ADMINISTRATIVE RECORD, REGARDING
COUNT II OF THE SECOND AMENDED COMPLAINT**

Now comes the Mundy, JOSEPH MUNDY ("Mundy"), by and through

his attorneys, DOBBS AND HUTCHISON, and Replies to Defendants'

Response as follows:

**Response to Defendants' Statement of Facts**

Defendants to Count II ("LINA") have made a number of

factual allegations in the "II. Factual Background" section of

their brief.  Mundy does not intend to heretofore argue all

facts in support of the claim, because it is Mundy's presumption

that the complete record will be argued in the future Motion for

Summary Judgment.  Nevertheless, and without waiving further

argument regarding the allegations of fact made by LINA, Mundy
addresses inaccurate or incomplete statements in the Response
brief as follows:

## A.  Vocational Evidence

Mundy provided, in the appeal documents during the claims
process, a report from a Vocational Expert, Susan A. Entenberg.
(Exhibit A)  Mundy's former position was determined by Ms.
Entenberg to be "significantly stressful", in that it required
management and supervision of personnel and management and
coordination of freight. (Exhibit A, p. 1)

## B.  Dr. James Tess

The deposition transcript of Dr. James Tess from December
22, 2005, is attached, because the opinion of Dr. Tess is a
lynchpin of Mundy's claim. (Exhibit B – transcript attached;
video will be submitted with Motion for Summary Judgment)
LINA's gave Dr. Tess' opinions inadequate discussion in their
summary of evidence.  Dr. Tess was the Mundy's primary treating
physician from 1999 and ongoing. (Id., p. 5)  Dr. Tess
coordinated the Mundy's visits, testing and treatment with the
specialists, Dr. Paredes, Dr. Markovitz, Dr. Gasior, Dr.
Iaffaldano, Dr. Chediak and Dr. Boll. (Id., p. 8 – 17)

Defendants' "II. Factual Background" statement failed to
include the fact that Dr. Tess specifically stated that it was

2

his opinion that Mundy was totally disabled from any and all work. (Exhibit B, pp. 17 - 23)  Dr. Tess stated that although the Mundy's protein blood deficiency would not automatically disable anyone who has the deficiency, that in Mundy's circumstance, the combination of both the deficiency and the blockage and stenosis of his arteries had become a disabling condition, because of the Mundy's increased risks of a stroke or cerebral vascular accident. (Id. p. 23)

Dr. Tess also gave the opinion that the Mundy's cognitive issues were disabling. (Id., p. 22) Mundy had not had any cognitive issues prior to the event of January, 2005. (Id., p. 24)

Additionally, in response to the Defendants' inclusion of references to various doctors' recommendations that the Mundy refrain from smoking, the Mundy points out that Dr. Tess gave the opinion that if the Mundy no longer smoked or consumer alcohol, that his condition would not improve. (Id., pp. 28 - 29)  The recommendations that Mundy discontinue smoking and consumption of alcohol were intended to prevent Mundy's condition from becoming worse.

## C.  **LINA's doctors.**

In LINA's factual background, LINA recites the opinions of its internal or contracted reviewing doctors.  The fact is that

3

none of the doctors examined Mundy, nor did they communicate with Mundy's treating physicians.

## D. Timing of Long Term Disability Denial

In the Argument section of the Response, LINA argued that the first denial of Long Term Disability benefits was already in the works, prior to the December 6, 2006 denial. That being said, the 'long form' application for Long Term Disability benefits was only filed 6 days prior to the denial, and the company was informed at that time that the Social Security Administration had awarded full and total disability to January 5, 2005. There is a question of fact as to whether the statements by Mundy contained in the November 30, 2006 'long form' application, and the Social Security Administration Administrative Law Judge's ruling were considered by LINA and its reviewing doctors prior to denying the claim, 6 days later.

## Argument - Standard of Review

Defendants to Count II take the position in Response to the motion that the standard of review in this case is 'deferential'. Mundy continues to assert that the correct standard of review is 'de novo'.

Mundy agrees that the language in the 'Group Disability Insurance Certificate' is the type that would trigger the deferential standard of review, if it was contained in the

4

policy.  Nevertheless, Mundy continues to argue that the proper
standard of review in this case is 'de novo', because the
language is not in the policy.  In <u>Sperandeo v. Lorillard</u>
<u>Tobacco Co., Inc.</u>, 460 F.3d 866 (7th Cir. 2006), where the policy
at issue did not contain language that triggered deferential
review, but the certificate of insurance and summary plan
document contained language that would trigger the deferential
standard review, the court found that the proper standard of
review was 'de novo'.  <u>Id</u>. at 871 – 872.  The reasoning for the
court's finding was that the certificate of insurance and
summary plan documents in that case were not incorporated by
reference.

In the same way, the language from the group policy cited
to in LINA's Response does not sufficiently incorporate the
certificate of insurance to trigger deferential review.    In the
case of <u>Bake v. Life Insurance Company of North America</u>, 07 C
6600 (N.D. Il. April 4, 2008)(Document #21)(Exhibit C), which
involved the same issues, the same defendant – LINA, and
identical language in the group policy and the certificate of
insurance and summary plan document, Judge Samuel Der-Yeghiayan
found the standard of review to be de novo.

Mundy makes the same argument in this case.  The group
policy states that a certificate of insurance will be delivered

to the insureds, but the language does not incorporate the language of the certificate into the group policy, and does not state that the language in the certificate of insurance will alter the terms of the group policy. (Id., p. 3)

Furthermore, LINA does not address the issue raised in Mundy's initial brief, that the certificate of insurance is dated March, 2005, after the commencement of the Mundy's Disability, and therefore is an ineffective amendment.  The document was originally filed in this litigation by the defendant to Count I, Mundy's former employer, Yellow Transportation, Inc. (Docket #36-2) and the accompanying affidavit did not state whether the amendment was effective on the date of the commencement of Mundy's Disability. (Id. pp. 2 - 3)

### Argument - Scope of Discovery

Pursuant to their ability to allow discovery by discretion, a number of judges in the Northern District of Illinois have allowed limited discovery in similar cases against LINA:

Bake v. Life Insurance Company of North America, 07 C 6600 (N.D. Il. April 4, 2008)(LINA Plan)(Exhibit C)

Marantz v. Permanent Medical Group, Inc. Long Term Disability Plan, 2006 U.S. Dist. LEXIS 87258 N.D. Il. 11/29/06)(06 C 3051)(Document #38)(LINA Plan)(Exhibit D)

Cameron v. Life Insurance Company of North America,

6

07 C 4038 (N.D. Ill. January 16, 2008)(Document #19)(LINA
Plan)(Exhibit E)

Discovery is relevant in this case because LINA's doctors,
who never examined Mundy, disagreed with the findings of The
Social Security Administration and Mundy's treating physicians,
in particular Dr. Tess, who treated Mundy for years prior to the
onset of disability, and who coordinated between Mundy's many
specialists.  Furthermore, it remains apparent that once the
Short Term Disability claim was denied, the work performed in
the Long Term Disability claim was apparently biased and
intended solely to continue to deny the Mundy Long Term
Disability benefits.  Mundy should be allowed to proceed with
the limited and controlled discovery requested.

If this Court were to find that a deferential standard of
review applies, the Plaintiff continues to request discovery, as
argued in the Motion.  In reply to LINA's position that
Metropolitan Life Ins. Co. v. Glenn, 128 S.Ct. 2343 (2008) does
not address discovery or alter the procedural framework for
resolving ERISA cases, Mundy points to an opinion by a District
Court Judge in New York, who found that Glenn supported the
allowance of the discovery requested in that case.  Cindy Hogan-
Cross v. Metropolitan Life Insurance Company, (08-C-0012)(U.S.
Dist. Southern District of New York, July 31, 2008).  Judge

Kaplan, in that case, found that Glenn had significantly altered the landscape in regards to discovery in ERISA claims, once a conflict has been shown. (Id., p. 8) "Information bearing on the manner in which a conflicted plan administrator compensates outside consultants could be highly pertinent.  Maintenance of compensation arrangements that create economic incentives for consultants to recommend denial or termination of benefits would have a material bearing on the likelihood that the administrator's conflict affects its benefits determinations." Id.  In Mundy's case, a conflict is evidenced by the fact LINA is the administrator and the insurer of the Long Term Disability Claim.  Limited discovery should be allowed to provide the court with the opportunity to fully evaluate the extent of the conflict at hand.

WHEREFORE, Mundy requests that he be granted leave to conduct limited discovery.

Respectfully submitted,
By /s/Roger S. Hutchison
/s/ Kenneth P. Dobbs

_____

Attorney for Mundy

Kenneth P. Dobbs
Roger S. Hutchison
Dobbs and Hutchison
47 West Polk Street
Suite M-2
Chicago, Il 60605
312-461-9800

04/12/2006 13:02 847 33681 S.ENTNBRG-PCHAB*SRVS PAGE 02

# REHABILITATION SERVICES ASSOCIATES

### 9933 N. Lawler Avenue Suite 317 Skokie, Illinois 60077

*Voice(847) 679-9700*
*Fax (847) 679-6991*

Susan A. Entenberg, MA, L.C.P.C.
Certified Rehabilitation Counselor

April 12, 2006

Kenneth P. Dobbs, Esq.
47 West Polk Street
Suite M-2
Chicago, Illinois 60605

## RE: Joseph P. Mundy

Dear Mr. Dobbs:

Per your request, I have reviewed the work history report, the job description from Yellow Freight of a linehaul supervisor and the deposition of Dr. Tess regarding Mr. Mundy. In specifically reviewing the job description from Yellow Freight, the job of linehaul supervisor is considered to be skilled with inherent stress factors. The job requires management and supervision of multiple truck drivers as well as responsibility for timely and cost-effective movement of freight. This requires a great deal of communication, both verbal and written, which includes hiring, disciplining, discharging and assessing performance of employees. The responsibility of movement of freight is vital to the profitability of the company and therefore requires skill and coordination of many parties. These factors create stress that is found in positions of personnel and material management and coordination.

According to the Dictionary of Occupational Titles, the job of linehaul supervisor, as it is commonly performed in the national economy, requires the same duties and non-exertional abilities. The job requires managing people and events, dealing with people, performing a variety of tasks at a skilled level and making ongoing judgments that affect profitability. Such factors are significantly stressful.

## Rehabilitation Services Associates

By: *Susan A. Entenberg*
Susan A. Entenberg, CRC, L.C.P.C.

*-Established 1979-*

Joseph MUNDY
LINA 00928
Ex. A

04/12/2006  13:02   847   3681          S. ENTNBRG-P HAB*SRVS          PAGE  03

# LifeStep DOT Browse

**Page 1**                    **Job Description Report**                    4/12/2006

## 009.137-010  DRIVER SUPERVISOR

Supervises and coordinates activities of TRACTOR-TRAILER-TRUCK DRIVER (any industry) 904.383-010 and TRUCK DRIVERS, HEAVY (any industry) 905.663-014 engaged in operating motor vehicles to haul materials for motor freight company or in off-highway haulage activities at industrial site. Performs duties as described under SUPERVISOR (any industry) Master Title.

| Aptitudes | Lvl | Temperaments | Lvl | Physical Demands | Lvl | Environmental | Lvl |
|---|---|---|---|---|---|---|---|
| General learning ability | 2 | Directing people or events | X | Climbing | N | Exposure to weather | F |
| Verbal skill | 2 | Repetitive tasks | | Balancing | N | Extreme Cold | N |
| Numerical skill | 3 | Influencing people | | Stooping | N | Extreme Heat | N |
| Spatial perception | 4 | Variety of tasks | X | Kneeling | N | Wet and/or humid | N |
| Form perception | 4 | Express personal feelings | | Crouching | N | Noise Intensity Level | 4 |
| Clerical perception | 3 | Alone or apart from others | | Crawling | N | Vibration | N |
| Motor coordination | 4 | Stress, dangerous tasks | | Reaching | F | Atmospheric conditions | N |
| Finger dexterity | 4 | Tolerances, precise limits | | Handling | F | Moving mechanical parts | F |
| Manual dexterity | 4 | Under specific instructions | | Fingering | F | Exposure to electrical shock | N |
| Eye-Hand-Foot coordination | 4 | Dealing with people | X | Feeling | N | High, exposed places | N |
| Color discrimination | 5 | Making judgments | X | Talking | F | Exposure to radiation | N |
| GED | Lvl | Work Fields | Lvl | Hearing | F | Working with explosives | N |
| Reasoning | 4 | Transporting | 13 | Tasting/Smelling | | Toxic or caustic chemicals | N |
| Math | 3 | | | Near Acuity | F | Other | N |
| Language | 4 | | | Far Acuity | N | | |
| Trailer | Lvl | MPSMS | Lvl | Depth Perception | F | | |
| Strength | L | Motor Freight Transportation and W | 853 | Accomodation | N | | |
| SVP | 7 | | | Color Vision | N | | |
| GOE | 05 08.01 | | | Field of Vision | O | | |

Joseph MUNDY
LINA  00929

Ex A

02/28/2006  12:30    8474333681              S.ENTNBRG-REHAB*SRVS              PAGE  01

*CURRICULUM VITAE*
# SUSAN A. ENTENBERG

**OFFICE ADDRESS:**

*9933 North Lawler Avenue*
*Suite 317*
*Skokie, Illinois 60077*
*(847) 679-9700*

**EDUCATION:**

*BOSTON UNIVERSITY*
Boston, Massachusetts
B.S., cum laude, Speech Pathology & Audiology
1970-1974

NORTHWESTERN UNIVERSITY
Evanston, Illinois
M.A., Counseling Psychology
1974-1975

INSURANCE REHABILITATION INSTITUTE
Philadelphia, Pennsylvania
Certificate (60 hours)
1978

**CERTIFICATIONS:**

*Licensed Clinical Professional Counselor*
State of Illinois - # 180-001566
Active Status

*Certified Rehabilitation Counselor*
Commission on Rehabilitation Counselor Cert.-#020934
Active Status

*Diplomate, ABVE 1987-2000*
American Board of Vocational Experts

*Rehabilitation Counselor Certification 1979-1985*
U.S. Department of Labor
Office of Workers' Compensation Programs

**CONSULTATIONS:**

Vocational Expert
Social Security Administration,
Office of Hearings and Appeals
1982-Present

Consultant to Menninger Foundn.,Topeka, KS
Grant re: *Return to Work*
1984-1986

Joseph MUNDY
LINA_00930
EX. A

02/20/2006  12:30    8474333681              S.ENTNBRG-REHAB*SRVS                    PAGE  02

**Susan A. Entenberg**
Page 2

Consultant to Mt. Sinai Hospital
1984-1986

Consultant to Chicago Tribune
Designed job analysis format
1980


**PRESENTATIONS:**

Speaker at Judicial Training Seminar
*Illinois Industrial Commission*
*"Vocational Rehabilitation"*
January, 1992

Speaker at Chicago Bar Association
*Industrial Commission Committee*
*"Vocational Rehabilitation in W.C. Cases"*
December, 1991

Speaker at 22nd Annual Conference
National Organization for Social Security
Claimant's Representatives
*"Vocational Expert Testimony"*
April, 1990

Speaker at *Chicago Bar Association*
Social Security Committee
*"Chronic Pain Issues"*
February, 1990

Speaker at Ill. Workers Compensation Lawyers
Women's Division
*"Vocational Rehabilitation in Workers'*
*Compensation Cases in Illinois"*
1989

Speaker at Grant Hospital
*"Carpal Tunnel and Vocational Issues"*
1986

Speaker at Workers' Compensation Seminar
Sponsored by *Seyfarth, Shaw, Fairweather &*
*Geraldson*
*"Vocational Rehabilitation - an Overview"*
1983

Joseph MUNDY
LINA 00931

Ex. A

**Susan A. Entenberg**
**Page 3**

Lecturer:

Illinois Institute of Technology
Graduate Program in Rehabilitation
Chicago, Illinois
1982-1986

WORK EXPERIENCE:

REHABILITATION CONSULTANT
REHABILITATION SERVICES ASSOCIATES
SKOKIE, ILLINOIS
1979-Present

VOCATIONAL CONSULTANT
INDUSTRIAL REHABILITATION CENTER
ST. JOSEPH MEDICAL CENTER
JOLIET, ILLINOIS
1994-2000

VOCATIONAL CONSULTANT
WESTLAKE INDUSTRIAL HEALTH PROGRAMS
WESTCHESTER, ILLINOIS
1991-2000

VOCATIONAL CONSULTANT
RUSH PRESBYTERIAN ST. LUKE MEDICAL CENTER
PSYCHIATRIC DAY HOSPITAL PROGRAM
CHICAGO, ILLINOIS
1991-1995

DIRECTOR OF VOCATIONAL SERVICES
PAIN MANAGEMENT, LTD.
HOFFMAN ESTATES, ILLINOIS
1988-1991

REHABILITATION SPECIALIST
INTERNATIONAL REHABILITATION ASSOCIATES
GLEN ELLYN, ILLINOIS
1978-1979

PROJECT COORDINATOR
GOODWILL REHABILITATION CENTER
CHICAGO, ILLINOIS
1977-1978

Joseph MUNDY
LINA 00932
Ex. A

**Susan A. Entenberg**
**Page 4**

                    HESTER EVALUATION SYSTEM REPRESENTATIVE
                    *GOODWILL REHABILITATION CENTER*
                    CHICAGO, ILLINOIS
                    1976-1977

                    REHABILITATION COUNSELOR
                    *GOODWILL REHABILITATION CENTER*
                    CHICAGO, ILLINOIS
                    1975-1976


CLINICAL EXPERIENCE:

                    M.A. Intern Program
                    Jewish Vocational Services
                    Chicago, Illinois
                    1975

                    Clinics for Hearing Impaired
                    Northwestern University
                    Evanston, Illinois
                    1974-1975

                    Student Intern
                    Crotched Mountain Rehabilitation Center
                    Greenfield, New Hampshire
                    1973

Joseph MUNDY
LINA_00933
Ex. A

1   STATE OF ILLINOIS )

2                    )  SS:

3   COUNTY OF C O O K )

4      IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

5            LAW DIVISION - COUNTY DEPARTMENT

6   JOSEPH MUNDY,                )

7            Plaintiff,          )
                                 )
8        v.                      )    Plan No. SHD 0985019
                                 )    Plan Holder:
9   CIGNA GROUP INSURANCE,       )    Yellow Roadway Corp.
                                 )
10           Defendant.          )

11

12      The video deposition of JAMES J. TESS, MD,

13   called for examination, taken pursuant to the

14   Illinois Code of Civil Procedure pertaining to the

15   taking of depositions, before RAYMOND F. PETERS, a

16   Notary Public within and for the County of Will,

17   State of Illinois, and a Certified Shorthand

18   Reporter of said state, at medical offices located

19   at 15300 West Avenue, Orland Park, Illinois, on the

20   22nd day of December, 2005, at 9:26 a.m.

21

22

23

24

Joseph MUNDY
LINA 00871

Ex. B

1    APPEARANCES:

2

3       LAW OFFICES OF ROGER S. HUTCHISON
        By:  Roger S. Hutchison, ESQ.

4       47 West Polk Street, Suite 321
        Chicago, Illinois  60605

5       (312) 461-9200
             on behalf of the Plaintiff;

6

7       Technician:  Raymond F. Peters

8       R. Peters & Associates
        19765 Cambridge Drive

9       Mokena, Illinois  60448
        (312) 446-6446

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Joseph MUNDY
LINA 00872

Ex. B

1      VIDEO TECHNICIAN:  My name is Ray Peters.

2   I am a video technician here on behalf of R. Peters

3   & Associates, also here for Dobbs & Hutchison.

4      This is the videotaped deposition of

5   Dr. James Tess, beginning at approximately 9:26

6   a.m., on the 22nd day of December, 2005.  This is

7   in the matter of Joseph Mundy versus Cigna Group

8   Insurance, Plan No. SHD0985019, Plan holder, Yellow

9   Roadway Corporation.

10      This is being taken at medical offices

11   located at 15300 West Avenue, Orland Park,

12   Illinois.  This deposition is being taken on behalf

13   of the plaintiff.

14      Will counsel please identify yourself for

15   the record?

16      MR. HUTCHISON:  Roger Hutchison.

17      VIDEO TECHNICIAN:  Would you raise your

18   right hand, doctor?

19            (Witness duly sworn.)

20

21

22

23

24

Joseph MUNDY
LINA 00873
Ex. B

1    JAMES J. TESS, MD,

2    having been called as a witness and duly sworn to

3    tell the whole truth, testified as follows:

4    EXAMINATION

5    BY MR. HUTCHISON:

6    Q    Doctor, would you please introduce

7    yourself and give a description of your background?

8    A    James J. Tess, T-E-S-S, MD.  I am a

9    family practice physician, general practice in

10   Orland Park.  I attended Rush Medical College in

11   Chicago, Illinois from 1991 to 1995 and graduated

12   as an MD.  I did my residency from 1995 through

13   1998 at Hinsdale Family Practice and have been

14   practicing in Orland Park since 1998.

15   Q    And are you familiar with the plaintiff,

16   Joseph Mundy?

17   A    Yes.

18   Q    And how long has Joseph Mundy been

19   treated by your practice?

20   A    He has been treated since 1999 in our

21   practice, and that was the first time that I saw

22   him also as a patient, was in 1999.

23   Q    Okay.  And have you seen him continuously

24   since 1999?

Joseph MUNDY
LINA 00874

Ex. B

1       A    Yes.

2       Q    Okay.  And are you his primary care

3    physician?

4       A    Yes.

5       Q    Okay.  The questions I am going to ask

6    you are all going to be whether or not your opinion

7    is to a reasonable degree of medical certainty.

8    Each time I ask you a question, I won't repeat that

9    phrase so as to make this go more smoothly.  At any

10   point if your medical opinion is not to a

11   reasonable degree of medical certainty, please let

12   me know.

13      A    Okay, yes.

14      Q    Would you please describe what has

15   happened with Joseph Mundy since January of this

16   year?

17      A    Joseph came to our office on January 6,

18   2005 complaining of a loss of vision to his right

19   eye.  Apparently, it occurred while he was at work.

20   It lasted for a couple of minutes where he had

21   complete black vision from his right eye and then

22   some blurred vision persisted at that time.  He

23   came to our office to have an examination.  We did

24   a routine vital signs and did an exam.

Joseph MUNDY
LINA 00875

Ex. B

1           From the best knowledge of my exam, his

2    exam was normal including his eye exam, yet not

3    being an opthalmologist at that point, we

4    immediately had him in contact with an

5    opthalmologist, Dr. Krats, K-R-A-T-S, for Joseph to

6    see him to make a determination as to why he had

7    this loss of vision in his right eye.  He at that

8    time went to see Dr. Krats.  Dr. Krats also did an

9    exam and after that sent -- actually, the same day,

10    I believe he sent -- he had sent us a letter after

11    he had seen Joe stating that at that point Joe had

12    had a what is called amaurosis fugax, that's M-A,

13    I'm sorry.  A-M-A-U-R-O-S-I-S, new word, F-U-G-A-S,

14    simply meaning an episode of loss of vision in his

15    right eye.

16           He did not see on his exam, Dr. Krats,

17    any evidence of an emboli or a detached retina or

18    other causes for the loss of vision in his right

19    eye, but stated that with this loss not being

20    normal that he should go ahead and undergo a

21    work-up both from a hematologic standpoint to see

22    if he had any hypercoagulable issue.

23    Hypercoagulable simply meaning increased risk of

24    clotting, or a cardiac work-up to further evaluate

Joseph MUNDY
LINA 00876
Ex. B

1   the cause of the loss of vision in his right eye.

2           After I received the letter, I did

3   contact the patient --

4           Q    Sorry, doctor.  What was the date of that

5   letter?

6           A    That letter -- it's dated January 5th,

7   but he came to see me January 6, so a little

8   confusing.  To the best of my recollection, he saw

9   me in the office and we then sent Joe immediately

10  to see Dr. Krats.  And Dr. Krats has been very good

11  to see our patients basically on the same day we

12  have sent them there.

13          Q    Okay.

14          A    So my belief is that this was January 6,

15  actually, not January 5th.

16          Q    Okay.

17          A    So he saw him on the same day, did the

18  exam and then gave a recommendation that we should

19  work him up from both a cardiac standpoint and from

20  a potential clotting standpoint.

21          Q    Okay.  So what happened next?

22          A    Then the next thing that happened was Joe

23  came back to the office on January 11th, 2005.  At

24  that time he was still complaining of the visual

Joseph MUNDY
LINA 00877
Ex. B

1  disturbance.  He also described some ongoing

2  fatigue and at that time it was decided that what

3  we needed to do was start the cardiovascular

4  work-up including an MRI of his brain, what are

5  called bilateral carotid Dopplers which are

6  ultrasounds of the carotid arteries.

7        The carotid arteries are the main large

8  arteries in the neck that bring blood up to the

9  head.  And at that time we also just discussed to

10  the use that he should be on an aspirin and

11  continue his blood pressure medication.  So we gave

12  him orders for those tests to be done and then he

13  proceeded with those tests.

14        At that time we also discussed that he

15  needed to follow up with an a hematologist and he

16  made an appointment with Dr. Jose Paredes,

17  P-A-R-E-D-E-S, who would do -- that hematologist

18  would do the vascular hematologic work-up looking

19  for clotting disorders.

20        He proceeded with getting the MRI and the

21  carotid Dopplers.  The MRI was done on January

22  13th, 2005.  The MRI showed that there were some

23  non-specific white matter changes that basically

24  states that there was some evidence of abnormality

Joseph MUNDY
LINA 00878
Ex. B

1    that they could see in the brain itself, kind of

2    the center part of the brain tissue. But it was

3    non-specific. They couldn't tell from the MRI

4    whether that had to do with everything from a

5    number of different neurologic and vascular

6    conditions.

7         And so with that finding, we then

8    received the results of the carotid Dopplers which

9    showed at the internal carotid Doppler -- I'm

10   sorry, the internal carotid artery, there was not

11   evidence of significant stenosis. And in the right

12   sided external carotid artery, there was some mild

13   stenosis that was present.

14        So we had that carotid Doppler test done

15   showing that there was not over-significant

16   blockage of those carotid arteries but there was

17   some mild blockage of the external carotid artery.

18        Q    What was the significance of that?

19        A    To me, the issue there was if there was

20   some mild stenosis of the largest arteries in the

21   neck, there could potentially be more significant

22   stenosis of the blood vessels as they got closer to

23   the brain.

24        Q    Okay.

Joseph MUNDY
LINA 00879

Ex. B

1   A   Right.  The patient then -- I apologize.

2   I am trying to see the link here.  The patient

3   followed up with a neurologist, Dr. Markovitz,

4   David Markovitz, M-A-R-K-O-V-I-T-Z, a neurologist

5   also in Palos Heights.  And I apologize, I can't

6   see the exact location of where I told him that he

7   should follow-up with the neurologist.  But it is

8   usual that a patient who would have a visual change

9   and an MRI that showed evidence that there could

10  potentially be some neurologic or vascular issue

11  going on, for us to refer to a neurologist.  I just

12  don't see where I documented that.  But,

13  nonetheless, as told to, he did follow-up with

14  Dr. Markovitz, the neurologist.

15      Dr. Markovitz examined the patient and

16  then ordered testing to be done which included what

17  is called an MRA, which is essentially an MRI.

18  It's a scan of the brain that includes what you

19  will call angiography or a closer examination of

20  the blood vessels.  That test showed that there was

21  about forty to fifty percent blockage of the

22  mid-vascular artery which is actually much further

23  up toward the brain.  And also the internal carotid

24  artery narrowing of approximately 60 to 70 percent.

Joseph MUNDY
LINA 00880

Ex. B

1    So that follows up with their being less blockage

2    of the external carotid arteries lower down in the

3    next.  But as you make your way up to the internal

4    carotid arteries and the vasoarteries, there was

5    more significant blockage or more significant

6    stenosis at that level.

7            When that result came to us, and that

8    test is dated January 24th, 2005, is when we told

9    the patient, discussed with the patient personally

10   on the phone that he needed to follow-up with a

11   vascular specialist.  So we gave him the name of

12   Dr. Gazior, G-A-Z-I-O-R, who is the vascular

13   specialist with Heartcare Centers, and the patient

14   followed up with Dr. Gazior.  I apologize.  I am

15   trying to get the dates correct here.

16           He saw doctor -- looks like he had the

17   MRI -- the MRA just after he saw Dr. Markovitz

18   because Dr. Markovitz noted -- the date on his note

19   was from January 24th, 2005.  And shortly

20   thereafter, he was seen by Dr. Paredes, a

21   hematologist, on February 1st, 2005 as he continued

22   with this work-up for this loss of vision in his

23   eye.

24           At that time, Dr. Paredes indicated that

Joseph MUNDY
LINA 00881

Ex. B

1  he wanted to start the work-up for the

2  hypercoagulability or the increased risk of

3  blockage by doing a certain number of tests to see

4  if he was at increased risk for blockages

5  genetically.  And Dr. Paredes gave Joseph the blood

6  work to be done.  The blood test, which is a long

7  length of different blood tests that needed to be

8  performed, came back, actually, to be within normal

9  limits except for what is called the activated

10  protein C resistance.

11       Not being a hematologist, this is a

12  little bit complex but, ultimately, this is a

13  protein that if it is absent or in reduced numbers,

14  increases the risk of clotting.  And it is a

15  genetic abnormality that would increase the risk of

16  clotting; that is, increase the risk of stroke for

17  Mr. Mundy by having this positive test, this

18  decreased protein level in his blood.

19       The patient was also followed up with Dr.

20  Gazior who had stated to the patient, at least from

21  his letter dated on February 7, 2005, that he had

22  had the Doppler studies, the MRI studies in front

23  of him.  He had reviewed those and that his

24  recommendation was a conventional angiogram to take

Joseph MUNDY
LINA 00882

Ex. B

1    a closer look at his vascular system.  And he did

2    undergo an aortigram on February 14th, 2005 which,

3    again, did not show evidence of the carotid

4    stenosis in the external carotid arteries.  It did

5    show some mild, actually, aneurysm-type dilation of

6    the proximal internal carotid arteries.  But at

7    least otherwise a relatively normal exam not

8    showing any evidence of what is called dissection

9    or a tearing of the arteries secondary to plaque

10   being on the arteries.  That was the main reason

11   why Dr. Gazior wanted to perform the testing.

12          Shortly thereafter, Dr. Mundy (sic)

13   actually saw Dr. Iaffaldano, and that's

14   I-A-F-F-A-L-D-A-N-O.  He is a cardiologist with

15   Heartcare Centers, also.  And Dr. Iaffaldano stated

16   that because of the plaque that was noted in the

17   internal carotid arteries that he would -- that

18   they would consider with discussions with Dr.

19   Gazior that the best thing for him would be most

20   probably a trial of an anti-platelet agent to

21   decrease the risk of the clot extending.  Those

22   agents can be aspirin or Plavix or ultimately

23   Coumadin, depending on the risk and on the benefit.

24          Dr. Iaffaldano did order a stress test,

Joseph MUNDY
LINA 00883
Ex. B

1   what is called an adenosine stress test, that's

2   A-D-E-N-O-S-I-N-E.  And this showed that there was

3   no evidence of ischemia or lack of blood flow to

4   the heart, and that was his main purpose in terms

5   of that.

6           Dr. Gazior and Dr. Iaffaldano also

7   ordered an MRI of the adrenal glands, one concern

8   being that potentially an adrenal gland abnormality

9   would also put him at increased risk for a

10  cardiovascular event.  If there was evidence of a

11  tumor on the adrenal gland, it would increase

12  certain enzymes to be produced that would increase

13  the risk of cardiovascular events occurring.

14          His MRI of his adrenal glands, though,

15  showed a small benign adenoma, A-D-E-N-O-M-A, but

16  otherwise no other abnormalities.

17          On follow-up with Dr. Paredes from a

18  letter dated March 10th, 2005, the patient and the

19  patient's wife apparently had a long discussion

20  with Dr. Paredes about what his risks were along

21  with what the plan of action should be at this time

22  for the fact that he had this positive or this, I

23  should say, abnormal activated protein C resistant

24  test, again, which increases risk of clotting

Joseph MUNDY
LINA 00884

Ex. B

1    events in the future.

2    At that time it looks as though a

3    discussion ensued about whether the patient should

4    be on aspirin and Plavix or also on Coumadin.  And

5    it looks as though the decision based upon a risk

6    and benefit was that he was better served being on

7    aspirin and on Plavix because of the risk of

8    significant bleeding on Coumadin.

9    Dr. Paredes said that the activated

10   protein resistant positive test was not by itself

11   enough to warrant Coumadin therapy, that it

12   certainly is an individual case-by-case risk versus

13   benefit basis and that although it certainly

14   increased his risk of thrombo-embolic events in the

15   future, they felt that the risk and benefit were to

16   be on aspirin and Plavix, essentially, for the rest

17   of his life.  He also recommended that family

18   members be tested, all of his children, for this

19   activated protein C resistance.  Again, a genetic

20   condition not changed by environmental factors that

21   could potentially increase the risk of clotting for

22   his children, also.  And I believe they underwent

23   that, also.

24   And it looks like Dr. Paredes saw Joe

Joseph MUNDY
LINA 00885
F. v. B

1    again -- Joseph, on May 19th, 2005.  At that time

2    in his letter he did indicate that Dr. Paredes had

3    spoken with a Dr. Juan Chediak, first name is

4    J-U-A-N, last name is spelled C-H-E-D-I-A-K, who is

5    from Illinois Masonic Medical Center, who

6    Dr. Paredes says is a noted coagulation expert, who

7    agreed at this time there was no specific need

8    Coumadin long-term, but that Joe was in a very

9    precarious situation because of intrinsic severe

10   peripheral vascular disease and again recommended

11   the Plavix and the aspirin in terms of medical

12   treatment at that time.

13          I saw Joseph again on February 22nd,

14   2005.  At that time his blood pressure was under

15   control and that was more of a visit just to kind

16   of discuss where we were in terms of him seeing the

17   other specialist.  And I saw Joseph again on

18   May 6, 2005, where at that time, again, it was more

19   of just a follow-up, in a sense, consultation to

20   talk about the entire work-up.  I like to have

21   patients come back just in case they have seen a

22   patient and I haven't received a letter from a

23   specialist so I have an idea of kind of where they

24   are in the work-up and what the specialists have

Joseph MUNDY
LINA 00886
Ex. B

1    said.  And at that time he was still having some

2    visual disturbance in his right eye.

3         We saw him again on July 21st of 2005.

4    This was actually seen by my associate,

5    Dr. Robert Boll, B-O-L-L.  And at that time he

6    talked about a follow-up, getting his blood

7    pressure checked which was stable at that time and

8    to talk about at that time in quotations, "a loss

9    of time and memory and cognitive disturbances" with

10   Dr. Boll at that time.  And the last time I have

11   seen him since this deposition was August 19th,

12   2005 where, again, he has a visual change of his

13   right eye and continuing cognitive and memory

14   disturbance.  And that was the last time that I had

15   seen him.

16        Q    Okay.  In your letter dated May 6, 2005,

17   you discussed Joe's abilities to work.  And you

18   stated at that time that Joe was disabled from all

19   work.  You also completed a report with -- for Met

20   Life Insurance that I am handing to you that is

21   dated May 17th, 2005, in which you state that Joe

22   is not able to return to his prior work and you

23   also state that he is totally disabled for any and

24   all work.  Is that still your opinion as of today?

Joseph MUNDY
LINA 00887

Ex. B

1    A    Yes.

2    Q    Okay.  Would you please explain that

3    opinion?  And I would ask that you explain that

4    opinion in reference to three things:  One is,

5    Joe's prior job as it was performed, which Joe has

6    explained to be a twelve-hour a day job, highly

7    stressful.  The second context is within a job

8    similar to Joe's but not at the 12-hour level, more

9    at an eight-hour-a-day level but still with stress

10   in the workplace.  And then the third context would

11   be a job that is a more sedentary job, I believe

12   Joe's prior work, but still a job that would

13   require forty hours week of attendance.

14   A    Joe at this time I think is from my best

15   medical information and knowledge, disabled on all

16   three levels.  One, Dr. Paredes in particular and

17   Dr. Gazior both in their letters are very straight

18   forward in saying that the -- that Joe is still at

19   high-risk of a vascular event potentially

20   occurring.  And even in the most recent letter make

21   it sound like he is at risk even with the

22   medications he is presently taking.

23          Certainly, at a 12-hour-a-day job with

24   high stress, his risk of having his blood pressure,

Joseph MUNDY
LINA 00888
Ex. B

1   even on medication, his blood pressure increase

2   causing vascular changes and an area where there is

3   already narrowing of a blood vessel in my mind

4   would increase his risk of something happening to

5   the point of him being unable to perform his

6   previous job.  I think the same is said for the

7   second level; that is, the same amount of stress,

8   in essence, but at a lower number of hours per day.

9        The patient, Joe Mundy, I think is still

10  at a large risk of an event happening and, again,

11  because of the fact that he has a deficiency of a

12  protein that we found on blood tests which

13  increases his risk and vascular tests that show

14  that he has narrowing of his internal carotid

15  arteries making any increased stress, increased

16  blood pressure and increased risk to his health in

17  terms of his work.

18       And then on the last level, I think that

19  any amount of work one could increase stress for

20  him, even at the simplest of jobs and certainly if

21  there is any risk of a visual loss or with some of

22  the memory and cognitive impairment that he has

23  displayed, I believe he is at risk of performing

24  any job regardless of the level of function of the

Joseph MUNDY
LINA 00889
Ex. B

1   job.

2   Q    Going back to the condition with the

3   combination of the stenosis and the genetic blood

4   abnormality, could you please explain that a little

5   bit further?  Ultimately, after all of these tests,

6   what is Joe's real problem in that area?

7   A    His biggest problem is that he has two

8   issues.  One is he has blockage.  He has narrowing

9   of the arteries, the interior carotid arteries.  I

10   believe it's at 60 percent, meaning that there is

11   only a 40 percent area for the blood to travel to

12   the brain.

13   Q    Okay.

14   A    Along with that, he has a deficiency of a

15   protein that -- all people have proteins that allow

16   our body to both clot when we cut ourselves, but

17   also to unclot so that we have blood that flows

18   through our arteries impeded -- unimpeded to the

19   organs they need to get to.  When you are deficient

20   of one of these proteins that Dr. Paredes tested

21   for, there are causes of an abnormality where a

22   patient is more likely to inherently have clots

23   develop in his vascular system, regardless of

24   whether you cut yourself or don't cut yourself.

Joseph MUNDY
LINA 00890

Ex. B

1    The normal balance between trying to stay in the

2    middle between clotting and unclotting, depending

3    on the needs of your body is kind of shifted

4    towards a clotting aspect of things.  So,

5    therefore, he is more likely to have further plaque

6    and clots develop onto areas where there isn't

7    already plaque and increased risk of further

8    development of the plaque in the areas where it's

9    already present.

10       Q    So, am I correct that it's not your

11   testimony that anyone with this protein blood

12   deficiency would be totally disabled?

13       A    Correct.  Anyone with this deficiency by

14   itself is not necessarily disabled, correct.

15       Q    Okay.  But you have, as I believe you

16   have explained in combination with blockage and

17   stenosis, that it has then become a disabling

18   condition for Joe?

19       A    Correct.  And it's not only the findings

20   itself, it's not the positive blood test and the

21   plaque that has already built up there, it's the

22   ultimate risk and the ultimate symptoms that

23   develop; that is, if somebody has the -- you can

24   have the positive gene blood test but have no

Joseph MUNDY
LINA 00891
Ex B

1   blockage in your arteries and you are probably, you
2   are certainly not at the same risk that Joe is at.
3   You can have plaque development in some of your
4   arteries but not be positive for the blood test and
5   not be at same risk that Joe is at.  But in
6   combination of having a positive blood test with a
7   protein that is absent to help keep clotting
8   normal, the clot that has been noted on the MRA
9   that was performed and his symptoms of having
10  visual loss in his right eye along with, again,
11  some of the cognitive and memory issues, that
12  combination is what I think makes him disabled,
13  unable to do the job.

14      Q    Okay.  And when you mention risk, what is
15  the risk?  What could occur?

16      A    What could occur is with overactivity,
17  increased blood pressure, increased stress, you can
18  actually get potentially a narrowing of one of the
19  vascular arteries in an area that you already have
20  a narrowing.  And in a person who doesn't have an
21  adequate system to clot and unclot the way others
22  who don't have the positive test would have, that
23  would increase his risk of a complete stenosis and
24  that would cause obviously increased blood pressure

Joseph MUNDY
LINA 00892
Ex. B

1    and obviously potentially a stroke or cerebral

2    vascular accident.

3        Q    Okay.  And what could be the possible

4    results of a stroke?  Would it just be vision loss

5    we are concerned about?

6        A    No, no.  Visual loss is potentially a

7    symptom but it could be everything from inability

8    to use your arm or your leg, difficulty with speech

9    and, ultimately, a stroke can actually be fatal.

10       Q    Okay.  Now, the second aspect of Joe's

11   disability that you referenced was a cognitive

12   issue, a memory issue.  Could you please describe

13   that further and is that related to his first

14   problem?

15       A    The cognitive issue for Joe is straight

16   forward.  He has noticed things like forgetting to

17   take his medications, forgetting where the car keys

18   were, simple things that you would normally not

19   forget.  He has found himself to be more forgetful

20   in terms of even simple activity of daily living,

21   so to speak.  And those -- the reason for those are

22   multi-factorial as there are a number of different

23   reasons why they can occur.  But one of the

24   potential reasons certainly can be due to vascular

Joseph MUNDY
LINA 00893

1    insufficiency, if you will, where if you have

2    narrowing of arteries taking blood to the brain,

3    that has the potential to cause both problems with

4    memory, concentration and other cognitive

5    abnormalities.  So there may be a connection

6    between those symptoms and the findings that we

7    have seen on the MRA, on the blood testing -- or

8    more on the MRA and then the MRI.

9         Q    Okay.  And prior to Joe's event in

10    January of this year, did he have any complaints in

11    the course of your treatment in regards to

12    cognitive problems?

13         A    No, he did not.  He did not.

14         Q    And you had seen him a number of times

15    prior to that event, is that correct?

16         A    That is correct.

17         Q    Okay.  And is that issue something that

18    is commonly related to a person who otherwise has

19    Joe's -- had an event like Joe's and has Joe's

20    conditions, arterial conditions?

21         A    The -- the -- every person may have

22    different extents of cognitive abnormality.  It's

23    difficult to ascertain.  There may be a patient who

24    has more plaque development than Joe who has less

Joseph MUNDY
LINA 00894

Ex B

1    cognitive impairment.  There may be someone who has

2    less plaque build-up and no positive blood test who

3    has more cognitive.  So it's a little difficult to

4    say in a sense does he fall where normal people

5    would -- where someone with the same amount of

6    plaquing would have the same amount of cognitive

7    impairment?  It may or may not, but definitely

8    patients with vascular insufficiency will more

9    likely develop cognitive impairment such as memory

10   deficiency, et cetera.  Again, there are a number

11   of reasons why it may occur but vascular certainly

12   is a possibility, and for Joe with the information

13   we have, this has certainly a possibility to be the

14   reason for his memory loss and cognitive

15   impairment.

16        Q    Okay.  A few more questions.  Dr. Krats,

17   in his letter had a phrase that -- back in January

18   that he stated that Joe had a clean bill of health.

19   Could you please describe that and what he meant by

20   that relative to Joe's overall condition?

21        A    First of all, certainly, although that

22   may be a summation, there certainly is not a

23   quotation in here that he had a clean bill of

24   health.  Dr. Krats' recommendation was for

Joseph MUNDY
LINA 00895
Ex. B

1    follow-up in one year and that may be where they

2    were getting that clean bill of health.  Basically,

3    Dr. Krats had stated that the patient, his loss of

4    vision in his right eye was not related to a pure

5    eye abnormality such as a retinal detachment or

6    what is called giant cell arteritis,

7    A-R-T-E-R-I-T-I-S, but rather that Joe had a loss

8    of vision in his right eye due to some other

9    factor, but just not related to the eye itself.

10    And when Dr. Krats states the patient needs a

11    hypercoagulable work-up and a carotid and cardiac

12    evaluation, that states to me that he doesn't imply

13    that there is nothing wrong but rather that it's

14    not an eye issue that he would deal with.

15        Q    Okay.  And, also, I showed you this

16    morning a copy of the letter from Cigna Insurance

17    from June of this year in which they denied

18    Mr. Mundy's claim.  And on the second page of that

19    letter, there is a paragraph that discusses a --

20    what they find to be a lack of a referral to a

21    stress management program.  Could you describe your

22    reasoning in relationship to a referral?  Is that

23    something that would normally be done in Joe's

24    circumstance?

Joseph MUNDY
LINA 00896
Ex B

1       A    It really is ultimately patient to
2   patient.  Each patient responds differently.  It is
3   not my usual standard of care for a patient who is
4   under a large amount of stress to say you have to
5   go to some relaxation or stress management class.
6   It's my usual practice to mention that there are a
7   number of different ways that you can go about
8   reducing stress.  Everything as simple as aerobic
9   exercise to yoga, to certainly stress management
10  classes but that one type might work better for one
11  patient versus another.  And so it is, of all the
12  patients that I treat for stress, it's actually
13  quite rare for them to have been referred to a
14  stress management, an official stress management
15  class.
16      Q    Okay.  And does the absence of a referral
17  reflect on the severity of Joe's condition?
18      A    It does not.  Again, the level of stress
19  does not imply what -- whether or not someone goes
20  for a stress management or not again.  Again, it's
21  more of a here are the options and what works best
22  for each individual patient.
23      Q    Then finally, the issue of Plavix and
24  Coumadin.  Does the choice of Plavix instead of

Joseph MUNDY
LINA 00897

Ex. B

1    Coumadin reflect upon the severity of Joe's issues?

2        A    I do not believe it does.  Again, a

3    neurologist and a hematologist would have maybe a

4    better opinion than myself.  But in my personal

5    opinion, seeing patients who have had strokes being

6    placed on Plavix and not on Coumadin tells me that

7    the severity of an instance doesn't always

8    determine the medication that is used.  Again, it's

9    -- ultimately for each patient it's a risk versus

10    benefit.  And in Joe's case, the combination of

11    aspirin plus Plavix in the mind of, again, Dr.

12    Paredes and then also the specialist he spoke to

13    from Illinois Masonic, indicated that he would have

14    at least hopefully the same equal protection of

15    being on those medications without the risk, the

16    extra increased risk of bleeding that would occur

17    by the use of Coumadin.

18        Q    All right.  Is there anything else -- I'm

19    sorry, I want to ask you one more question.  There

20    are references in the various records as to Joe's

21    use of alcohol and/or smoking.  And the question I

22    want to ask is, if Joe didn't have any smoking or

23    any alcohol, would these problems go away?

24        A    The problems would, at this point would

Joseph MUNDY
LINA 00898

Ex. B

1   not go away regardless of smoking or alcohol

2   abstinence.

3       Q    Okay.

4       A    Right.

5       Q    At the same time, certainly, it's not

6   recommended that Joe smokes, I presume?

7       A    Correct, correct.  The ideal for Joe is

8   to not smoke but smoking does not, for example --

9   has no result upon the positive activated protein C

10  resistant blood test.  There is no link between the

11  two.  That's a genetic issue and, therefore -- and

12  that could happen in smokers and non-smokers alike.

13      Q    And at this point if Joe didn't smoke

14  entirely from here on out with his stenosis or the

15  carotid arteries, what would happen to them?

16      A    Hopefully, they would stay at the same

17  level they are at and they wouldn't worsen.  But I

18  don't believe there is evidence that if he stops

19  smoking by itself that that would necessarily

20  alleviate the stenosis.

21          MR. HUTCHISON:  Okay, thank you very

22  much, doctor.

23          THE WITNESS:  Thank you.

24          VIDEO TECHNICIAN:  The time is now

Joseph MUNDY
LINA 00899

Ex. B

1    approximately 10:06 a.m., and that will conclude

2    the deposition of Dr. Tess.  We are off the record.

3

4                    (Proceedings concluded.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Joseph MUNDY
LINA 00900

Ex B

1  STATE OF ILLINOIS   )

2                      )  SS:

3  COUNTY OF COOK      )

4

5      I, RAYMOND F. PETERS, Certified Shorthand

6  Reporter No. 084-002123, and Notary Public in and

7  for the County of Cook State of Illinois, do hereby

8  certify that previous to the commencement of the

9  examination, said witness was duly sworn by me to

10  testify the truth; that the said deposition was

11  taken at the time and place aforesaid; that the

12  testimony given by said witness was reduced to

13  writing by means of shorthand and thereafter

14  transcribed into typewritten form; and that the

15  foregoing is a true, correct, and complete

16  transcript of my shorthand notes so taken as

17  aforesaid.

18      I further certify that the witness was by

19  me first duly sworn to testify the truth, the whole

20  truth, and nothing but the truth in the cause

21  aforesaid; that the testimony then given by the

22  said witness was reported stenographically by me in

23  the presence of said witness and afterwards reduced

24  to writing, and the foregoing is a true and

R. PETERS & ASSOCIATES
(312) 446-6446

Joseph MUNDY
LINA 00901
Ex.B

1   complete transcript of the testimony so given by

2   the said witness as aforesaid.

3         I further certify that there were present

4   at the taking of the said deposition the persons

5   and parties as indicated on the appearance page

6   made a part of this deposition.

7         I further certify that I am not counsel

8   for nor in any way related to any of the parties to

9   this suit, nor am I in any way interested in the

10  outcome thereof.

11        I further certify that this certificate

12  applies to the original signed IN BLUE and

13  certified transcripts only.  I assume no

14  responsibility for the accuracy of any reproduced

15  copies not made under my control or direction.

16        IN TESTIMONY WHEREOF,  I have hereunto set

17  my hand this 5th day of January, 2006.

18

19  _____

20  RAYMOND F. PETERS, CSR

21  Notary Public, Cook County, Illinois

22

23

24

R. PETERS & ASSOCIATES
(312) 446-6446

Joseph MUNDY
LINA 00902
Ex. B

Order Form (01/2005)

Case 1:09-cv-01576   Document 65-4   Filed 09/02/2008   Page 1 of 5
Case 1:07-cv-06600   Document 25-4   Filed 04/04/2008   Page 1 of 5

## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Samuel Der-Yeghiayan | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 07 C 6600 | **DATE** | 4/4/2008 |
| **CASE TITLE** | Janice Bake vs. Life Insurance Company of North America | | |

**DOCKET ENTRY TEXT**

For the reasons stated below, Defendant's motion for protective order [15] is denied.  All dates previously set are to stand.

■[ For further details see text below.]                                              Docketing to mail notices.

---

### STATEMENT

This matter is before the court on Defendant Life Insurance Company of North America's ("LINA") motion for a protective order.  LINA seeks a protective order under Federal Rule of Civil Procedure 26(c) to quash the subpoena Plaintiff Janice Bake ("Bake") served on Avrom Simon, M.D. ("Simon").  Bake alleges in her complaint that she was employed by Corus Bank ("Corus") until June 2006, when she was forced to stop work due to a severe degenerative disease of the spine.  After ceasing employment, Bake allegedly made a claim for long-term disability ("LTD") benefits under an employee benefits plan ("Benefits Plan"), which was administered under a group policy ("Group Policy").  LINA is allegedly the underwriter and insurer of the Benefits Plan.  Bake states that she also applied for and was ultimately awarded Social Security benefits. In November 2006, LINA denied Bake's claim for LTD benefits.  Bake allegedly submitted an administrative appeal and included medical evidence from her treating physicians in support.  LINA allegedly denied the appeal, and Bake filed a second administrative appeal.  LINA then allegedly denied the second appeal, relying on the report of Simon, who Bake contends never examined her.  Bake then brought the instant action seeking a review, pursuant to 29 U.S.C. § 1132 of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* ("ERISA"), of LINA's decision to deny her claim for LTD benefits.

Ex. C

## STATEMENT

Bake served Simon with a subpoena to appear for a deposition in this case and LINA moves to quash the subpoena served on Simon by Bake. LINA asserts that Simon is an independent physician, who LINA employed to evaluate Bake's administrative appeal. LINA contends that discovery must be limited in this case and that Bake is only entitled to the administrative record in this case.

I. Proper Standard of Review

The parties disagree regarding the proper standard of review in this case. Ordinarily a court reviews a decision of an ERISA plan administration under the *de novo* standard. *Perlman v. Swiss Bank Corp. Comprehensive Disability Protection Plan*, 195 F.3d 975, 980 (7th Cir. 1999). However, if the ERISA plan "establishes discretionary authority then review will be deferential." *Id.* Bake contends that the court should apply a *de novo* standard of review in this case and LINA argues that the court should apply a deferential standard of review. LINA argues that the Group Insurance Plan ("Group Insurance Plan") that is related to the Group Policy states that the "Insurance Company shall have authority, in its discretion, to interpret the terms of the Plan, to decide questions of eligibility for coverage or benefits under the Plan, and to make any related findings of fact." (Mot. 6-7).

LINA argues that the instant action is similar to *Shyman v. Unum Life Ins. Co.*, 427 F.3d 452 (7th Cir. 2005), in which a "package" of plan documents included a group policy, a summary plan description, and a certificate of insurance. *Id.* at 454-55. Although the group policy and summary plan description in that case did not provide the insurance company with discretion, the certificate of insurance included discretionary language. *Id.* at 455. The Seventh Circuit held that the deferential review applied based on the discretionary language in the certificate of insurance. *Id.* at 455-56. Similarly in the instant action, the discretionary language in the Group Insurance Plan, although not in the Group Policy, triggers the deferential review.

However, in *Sperandeo v. Lorillard Tobacco Co., Inc.*, 460 F.3d 866 (7th Cir. 2006), the policy at issue lacked discretionary language and the court did not find discretionary language in the certificate of insurance and the summary plan document to be sufficient to warrant the deferential standard of review. *Id.* at 872. In *Sperandeo*, the court based its holding on the fact that the summary plan description and the certificate of insurance were "not incorporated by reference into the policy or plan." *Id.* at 871. The court in

Ex.C

## STATEMENT

*Sperandeo*, thus concluded that the *de novo* standard of review applied. *Id.* at 872.

LINA argues that the instant case is distinguishable from *Sperandeo* because "the Group Policy here incorporates the terms of the Group Insurance Plan." (Reply 5). LINA contends that certain language in the Group Policy indicates incorporation. (Reply 5). However the language in the Group Policy referred to by LINA, does not state that any terms of the Group Policy would in the future be incorporated into the Group Insurance Plan or that the Group Insurance Plan's terms would be incorporated into the Group Policy. The portion of the Group Policy pointed to by LINA states that "[a] certificate of insurance will be delivered to the Employer for delivery to Insureds." (Compl. Ex. A 16). The mere notification that the certificate would be delivered does not indicate that its terms will be incorporated into the Group Policy. The Group Policy also states that "[e]ach certificate will list the benefits, conditions and limits of the Policy," and "[i]t will state to whom benefits will be paid." (Compl. Ex. A 16). Such language indicates that the certificate will list certain information and explain who will receive the payment of benefits. It does not indicate that any terms in the certificate will be incorporated into the Group Policy or will alter the terms of the Group Policy. Thus, this case is similar to *Sperandeo*, in that we are faced with a plan that does not contain discretionary language for the plan administrator, and there are not other documents with discretionary language that are incorporated into the plan. Thus, as the Court concluded in *Sperandeo*, we conclude that the *de novo* standard of review applies. We also note that even if the discretionary language in the Group Insurance Plan applied in this case, Bake has pointed out that Illinois issued a prohibition against discretionary clauses in disability insurance policies in 50 Ill. Admin. Code § 2001.3 ("Section 2001.3"). Section 2001.3 took effect July 1, 2005. LINA has attached documentation showing that the Group Policy took effect on January 1, 2003. (Reply Ex. A 1). LINA argues that although the Group Policy is renewed each year on January 1, the terms remained the same, and the terms and the conditions of the original policy became part of the renewal contract. *See Burmac Metal Finishing Co. v. West Bend Mut. Ins. Co.*, 825 N.E.2d 1246, 1255 (Ill. App. Ct. 2005)(stating that "[u]nless provided otherwise, it is the general rule that when a policy renewal is made, the terms and conditions of the original policy become part of the renewal contract of insurance"). However, regardless of the terms that were incorporated into each renewal of the Group Policy, on each January 1 after January 2005, a new contract was formed. The formation of each new contract thus occurred after Section

Ex. C

## STATEMENT

2001.3 took effect.


II.  Scope of Discovery

In ERISA cases, in certain instances discovery can be limited to the administrative record if the deferential standard of review is applied. *See Vallone v. CNA Financial Corp.*, 375 F.3d 623, 629 (7th Cir. 2004)(affirming district court's limitation of discovery to the administrative record and indicating that "'[d]eferential review of an administrative decision means review on the administrative record'")(quoting in part *Perlman v. Swiss Bank Corp. Comprehensive Disability Prot. Plan*, 195 F.3d 975, 980 (7th Cir. 1999)); *Perlman*, 195 F.3d at 980 (holding that "when review under ERISA is deferential, courts are limited to the information submitted to the plan's administrator"). However, in this case the *de novo* standard of review applies. The Seventh Circuit has indicated that a court may "allow[] parties to take discovery and present new evidence in ERISA cases subject to *de novo* judicial decisions. . . ." *Perlman*, 195 F.3d at 982. In ERISA cases, whether being reviewed under the deferential standard or the *de novo* standard, "'district courts enjoy broad discretion in controlling discovery.'" *Semien v. Life Ins. Co. of North America*, 436 F.3d 805, 813 (7th Cir. 2006)(quoting *McCarthy v. Option One Mortgage Corp.*, 362 F.3d 1008, 1012 (7th Cir. 2004)).

In the instant action, Bake has provided sufficient justification for her request to depose Simon. Bake has raised legitimate concerns as to Simon's conclusions. Simon did not ever examine Bake and his conclusions were contrary to those of Bake's treating physicians. In addition, although the standard employed in assessing a disability in a Social Security case is not the same standard that will be employed in this case, Bake has shown that her request for Social Security benefits was ultimately granted. Also, Bake has pointed to evidence in the record showing that she legitimately has a serious medical ailment. Thus, the discovery sought by Bake in regard to Simon is warranted.

In addition, it is important to note that Bake is not requesting other discovery in this matter. Her request is solely limited to the deposition of Simon and should not be overly burdensome on LINA. In fact, counsel for LINA acknowledged at the last status hearing that Simon is an independent physician and not an employee of LINA. Also, at the status hearing, counsel for LINA indicated that if Bake were to depose

Ex. C

## STATEMENT

Simon, the only inconvenience to LINA would be that it would need to send a representative to the deposition. Considering the potential relevance of Simon's deposition testimony and the minimal burden on LINA, in our discretion, we conclude that Bake should be allowed to depose Simon. We also note that even if the deferential standard applies, the circumstances are such that the extremely limited discovery in regard to Simon sought by Bake would be warranted. *See Vallone*, 375 F.3d at 629 (indicating that even in a case where deferential review applied, the district court had discretion in dealing with discovery matters). Therefore, we deny LINA's motion for a protective order.

Ex. C



## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| SUSAN MARANTZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 06 C 3051 |
| | ) | |
| PERMANENT MEDICAL GROUP INC. | ) | |
| LONG TERM DISABILITY PLAN and | ) | |
| LIFE INSURANCE COMPANY OF | ) | |
| NEW YORK, | ) | |
| | ) | |
| Defendants. | ) | |

### MEMORANDUM OPINION AND ORDER

Plaintiff has sued for long-term disability benefits. The standard of review is *de novo*, which, in this court's view, is increasingly rare in this area of the law. Plans nowadays usually seek the protection of a discretionary standard. But here it is *de novo*, and that led Judge Shadur to permit plaintiff to take some depositions. Defendant now moves for reconsideration, contending that discovery is warranted only if plaintiff makes a showing that the decision may be tainted, and she has not made such a showing here. The motion is denied.

The arguments of the parties rest on three cases: <u>Casey v. Uddeholm Corp.</u>, 32 F.3d 1094 (7th Cir. 1994); <u>Perlman v. Swiss Bank Comprehensive Disability Protection Plan</u>, 195 F.3d 975 (7th Cir, 1999) and <u>Semien v. Life Insurance Co. of North America</u>, 436 F.3d 805 (7th Cir. 2006). And they do not provide a clear answer. <u>Casey</u> involved *de novo* review and permitted discovery beyond the administrative record, although it may have been appropriate only if necessary for adequate judicial review (and in what circumstances a court might consider discovery necessary is open to varying interpretations). <u>Perlman</u> is somewhat more

Ex. D

restrictive, but there the standard of review was deferential. In dictum, the court noted that discovery was allowed in *de novo* cases, unless there could be no doubt the application was given a genuine evaluation. Semien makes clear that there has to be a *prima facie* showing of bias or conflict of interest to justify going beyond the administrative record, but the court was careful to confine its holding to cases providing only deferential review.

We think, in balance, that discovery in *a de novo* review case is a discretionary call, with the court deciding whether some discovery might be helpful to the court (and with a recognition that it is difficult to show any taint without some disclosure). At least one district court has held as much. *See* Burns v. Am. United Life Ins. Co., 2006 WL1004884 (S.D.Ill. Apr. 17, 2006). Judge Shadur heard the parties; he exercised his discretion. This court sees no reason to disturb it.

James B. Moran
**JAMES B. MORAN**
Senior Judge, U. S. District Court

Nov. 29 , 2006.

Ex. D

Order Form (01/2005)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan H. Lefkow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 07 C 4038 | **DATE** | 1/16/2008 |
| **CASE TITLE** | Cameron vs. Life Insurance Company of North America | | |

## DOCKET ENTRY TEXT

Plaintiff's motion to compel discovery [#14] is granted in part and denied in part as explained below.

■[ For further details see text below.]                          Notices mailed by Judicial staff.

---

## STATEMENT

The plaintiff, Karen Cameron ("Cameron"), who is seeking restoration of long-term disability benefits in this ERISA case, filed a motion to compel discovery. She is asking the court to require the defendant, Life Insurance Company of North America ("LINA") to produce two witnesses for deposition: Dr. John Mendez, a medical director employed by LINA who evaluated the medical evidence she submitted in support of her claim, and Medha Bharadwaj, a claims analyst who worked on her administrative appeal.

The parties agree at this point in the litigation that the court should apply the *de novo* standard of review to evaluate LINA's decision. *See Patton* v. *MFS/Sun Life Fin. Distributors, Inc.*, 480 F.3d 478, 485-86 (7th Cir. 2007). Cameron argues that when the *de novo* standard is applied, discovery is "routinely permitted," and that under the Federal Rule of Civil Procedure 26(b), the scope of discovery in all civil actions is broad. *See* Cameron's motion to compel, at 2; Reply, at 1. This characterization is inconsistent with the Seventh Circuit's recent articulation of the standard that district courts should apply when deciding whether to allow discovery beyond the administrative record in *de novo* ERISA cases. In *Patton*, the Seventh Circuit discussed a motion for discovery outside of the administrative record. 480 F.3d at 489. It explained that district courts have discretion to admit or not to admit new evidence, and that the "most central" factor they should consider is "whether the evidence is 'necessary' to an 'informed and independent judgment' on the parties' claims and defenses, which will obviously depend on the nature of the claims and whether the administrative record was 'relatively undeveloped' with respect to those claims." *Id.* at 491 (citations omitted). Furthermore, the court said, "it is very hard to say that the district court abused its discretion in deciding not to hear additional evidence in an ERISA case. A court should not automatically admit new evidence whenever it would help to reach an accurate decision. *Any* relevant, probative evidence increases the likelihood of an accurate decision, but always at the price of increased cost, both in the form of more money and additional time." *Id.* at 492.

---

*Ex. E*

## STATEMENT

Cameron argues that Ms. Bharadwaj's deposition is necessary "because there is no basis revealed in the claim record to support LINA's abrupt termination of disability benefits after more than 10 years of payment when the plaintiff suffered from multiple ... impairments and why the opinion of LINA's own independently selected examiner, Dr. Moisan [], was disregarded. In addition, because the claim administrator is required to consider the evidence submitted by both sides [], the claim analyst needs to explain why the evidence and argument submitted with plaintiff's pre-suit claim appeal [was rejected] and how that evidence was evaluated in the ultimate claim denial []." Cameron's Motion, at 3. As stated in *Diaz v. Prudential Ins. Co. of America*, 490 F.3d 640, 643 (7th Cir. 2007), however, when applying the *de novo* standard of review, the district courts are not reviewing the decision made by the administrator; they are making an "independent decision about the employee's entitlement to benefits.... What happened before the Plan administrator or ERISA fiduciary is irrelevant. That means that the question before the district court [is] not whether [the administrator] gave [the claimant] a full and fair hearing or undertook a selective review of the evidence; rather, it [is] the ultimate question whether [the claimant] was entitled to the benefits he sought under the plan." (Citations omitted.) It is not necessary to depose Ms. Bharadwaj to determine whether Cameron was entitled to long-term disability benefits under the applicable plan. The court will have the same record before it as Ms. Bharadwaj had, and its decision must be made independently of hers. Therefore, the court will not compel LINA to produce her.

The analysis is different for Dr. Mendez. Although the medical evidence that Cameron submitted to LINA is not yet in the record, the facts recited in the briefing on this motion reflect that Cameron's doctors had a difference of opinion regarding her ability to perform sedentary work. Dr. Mendez apparently had the task of reviewing at least four different medical opinions (submitted by Doctors Balk, Curran, Djordjevic, and Moisan) to make the final determination of whether she could perform such work or not. His analysis and conclusion that she could, however, is presented in only one short paragraph. Because the court is not a medical expert, it would be very helpful to have additional information from Dr. Mendez on how he weighed the differing medical opinions. For this reason, the court will exercise its discretion to allow Cameron to depose Dr. Mendez, and therefore grants Cameron's motion to compel on this point.

Ex. E

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
CINDY HOGAN-CROSS,

                        Plaintiff,


            -against-                                    08 Civ. 0012 (LAK)


METROPOLITAN LIFE INSURANCE
COMPANY, et ano.,

                        Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## MEMORANDUM OPINION


                Appearances:

                        Justin Corey Frankel
                        Jason A. Newfield
                        FRANKEL & NEWFIELD, P.C.
                        *Attorneys for Plaintiff*


                        Allan Michael Marcus
                        LESTER, SCHWAB, KATZ AND DWYER LLP
                        *Attorney for Defendants*


LEWIS A. KAPLAN, *District Judge.*

                This is an action to recover benefits under an ERISA plan from defendant

Metropolitan Life Insurance Company ("MetLife"). Plaintiff moved to compel discovery. As often

has been the case, the defendants resisted any material disclosure, contending that review of its

termination of benefits is measured by the arbitrary and capricious standard and, moreover, that such

*Ex. F*

2

review is confined to the administrative file. To the extremely limited extent that MetLife addressed

the relevance of particular discovery requests,[1] it contended only that interrogatories 14 and 15 and

document request 14 were "mainly irrelevant to 'exploring' conflict of interest" and passed quickly

to its contention that plaintiff had failed to show that the administrative record was inadequate for

the purpose of determining "how a conflict of interest actually influenced MetLife's claim

determination." By order dated July 3, 2008, the Court granted plaintiff's motion to compel in

significant measure. MetLife now moves for reconsideration of that ruling in significant measure.

*Timeliness*

MetLife first sought reconsideration by electronically filing, on July 18, 2008, a letter

seeking that relief. But Section 13.1 of this Court's Electronic Case Filing Rules and Instructions

prohibits the electronic filing of letters. Accordingly, the Clerk rejected the letter. On July 21, 2008,

MetLife filed the motion to reconsider that now is before the Court.

S.D.N.Y. Civ. R. 6.3 requires that a motion for reconsideration be filed no later than

10 days after the date of entry of the order in question. As the period in question is less than 11 days,

the July Fourth holiday and intervening weekend days are excluded.[2] Accordingly, the last day on

which to file a motion for reconsideration was July 18, 2008. While defendants attempted to file on

that date, their filing was ineffective in light of the fact that the Clerk properly rejected the filing

because it contravened the rules.

---

[1]

    *See* DI 33, at 3.

[2]

    FED. R. CIV. P. 6(a).

ExF

The prohibition of the electronic filing of letters is a carefully considered policy of this Court that serves important purposes. Such communications often are erroneously docketed as motions (although that was not the case here), thus creating difficulties for the Court's ability to track and account for motions. They also burden the docket and the associated electronic storage facilities with unnecessary material. Moreover, the prohibition on electronic filing of letters has been well publicized to the Bar for years, as it appears in written materials disseminated by the Clerk's Office and has been posted on the Court's web site for a long time. Accordingly, the Court is reluctant to relieve MetLife of the consequences of missing the deadline as a result of its failure to comply with such a well-publicized policy. Nonetheless, the Court will treat the present motion as timely notwithstanding this failure *in this instance.* It will not do so in the future for MetLife or for its attorneys, whether in this or other cases.

*The Standard*

Relief is available under Local Civil Rule 6.3 only if the movant demonstrates that the "'Court overlooked controlling decisions or factual matters that were put before the Court on the underlying motion.'"[3] Such a motion "'may not advance new facts, issues or arguments not previously presented to the court.'"[4] Indeed, as our former Chief Judge Mukasey has written, a party

---

[3] *Auscape Int'l v. Nat'l Geographic Soc'y,* No. 02 Civ. 6441(LAK)(HBP), 2003 WL 22127011, at *1 (S.D.N.Y. Sept.15, 2003) (quoting *Am. Alliance Ins. Co. v. Eagle Ins. Co.,* 163 F.R.D. 211, 213 (S.D.N.Y. 1995), *rev'd on other grounds,* 92 F.3d 57 (2d Cir. 1996)).

[4] *Id.* at *1 (quoting *In re Integrated Res. Real Estate Ltd. P'ships Sec. Litig.,* 850 F. Supp. 1105, 1151 (S.D.N.Y. 1994). *Accord In re Laser Arms Corp. Sec. Litig.,* No. 86 Civ. 3591(JMC), 1990 U.S. Dist. LEXIS 349, at *3-4 (S.D.N.Y. Jan. 17, 1990) (citing *Weissman v. Fruchtman,* 124 F.R.D. 559, 560 (S.D.N.Y. 1989)); *Litton Indus., Inc. v. Lehman Bros.*

Ex. F

4

seeking reconsideration "is not supposed to treat the court's initial decision as the opening of a dialogue in which that party may then use such a motion to advance new theories or adduce new evidence in response to the court's rulings."[5]

*Discussion*

    1.    MetLife first disputes the ruling with respect to document requests 14 and 28-30, interrogatories 14-16, and deposition topics 4 and 6 on the grounds that the time period covered is overbroad and that they do not seek relevant information because "they have nothing to do with conflict of interest."

    As an initial matter, the Court declines to reconsider either the time period or other aspects of its ruling on these requests save that part which related to document request 14 and interrogatories 14 and 15 because the arguments now made were not advanced in MetLife's opposition to the motion to compel. MetLife's only objection to the other discovery requests was the bald assertion that depositions and broad discovery inquiries are not permitted "when there is no evidence in the administrative record of any actual conflict."[6] Having declined to challenge on the original motion the relevance of plaintiff's specific requests if, contrary to its argument, discovery is permissible even assuming there is no evidence in the administrative record of any conflict,

---

[5]    *Kuhn Loeb Inc.,* No. 86 Civ. 6447(JMC), 1989 WL 162315, at *4 (S.D.N.Y. Aug. 4, 1989), *rev'd on other grounds,* 967 F.2d 742 (2d Cir. 1992).

[6]    *Polsby v. St. Martin's Press, Inc.,* No. 97 Civ. 690(MBM), 2000 WL 98057, at *1 (S.D.N.Y. Jan. 18, 2000) (quotation marks and citation omitted).

DI 33, at 2.

*Ex. F*

5

MetLife will not be heard to do so now. In any case, even if the Court were disposed to entertain reargument as to these requests, MetLife would fare no better.

In *Metropolitan Life Insurance Co. v. Glenn*,[7] the Supreme Court held that "a plan administrator [that] both evaluates claims for benefits and pays benefits" – precisely MetLife's position here – has a conflict of interest for ERISA purposes.[8] It further made clear that the existence of such a conflict is a factor to be weighed by a court when reviewing the denial of benefits, the significance of which will vary depending upon other circumstances.[9] Moreover, the Court made clear its view that it is neither "necessary [n]or desirable for courts to create special burden-of-proof rules, or other special procedural or evidentiary rules, focused narrowly upon the evaluator/payor conflict."[10] Accordingly, MetLife's notion that discovery is inappropriate in this case because "there is no evidence in the administrative record of any actual conflict," a dubious proposition to begin with before *Glenn*,[11] is misguided. The question here, as in all cases, is whether the discovery sought is relevant in itself or "appears reasonably calculated to lead to the discovery of admissible evidence."[12]

---

[7]

128 S. Ct. 2343 (2008).

[8]

*Id.* at 2348-50.

[9]

*Id.* at 2350-52.

[10]

*Id.* at 2351.

[11]

See, e.g., *Trussel v. CIGNA Life Ins. Co. of New York*, 552 F. Supp. 2d 387, 389-91 (S.D.N.Y. 2008); *Pelosi v. Schwab Capital Mkts., L.P.*, 462 F. Supp. 2d 503, 510 (S.D.N.Y. 2006).

[12]

FED. R. CIV. P. 26(b)(1).

Ex. F

The requests at issue here seek evidence concerning approval and termination rates for IBM long term disability claims and statistics regarding long term disability claims administered by MetLife in litigation. To be sure, evidence of high rates of denial and termination of claims, in and of themselves, would prove little or nothing. High rates of denial might reflect only that high proportions of such claims were not meritorious. High rates of termination might reflect only that high proportions of persons who initially were granted disability benefits improved over time and ceased to be eligible for benefits. But that is not to say that evidence of rates of claim denials and benefit terminations would not be reasonably calculated to lead to the discovery of admissible evidence. Evidence of high rates of benefit denials or terminations reasonably could lead to further inquiry as to the reasons for those actions, which might prove either benign or malignant. Accordingly, even if the Court were to grant reconsideration with respect to these requests, it would adhere to its former decision.

2.    MetLife next challenges the ruling insofar as it applied to document request 12 and interrogatories 5, 6, and 17. Broadly speaking, those requests, to the extent enforced by the Court, seek information regarding the compensation of "persons involved in evaluating, advising upon, or determining plaintiff's eligibility for continued benefits." MetLife contends the information in question is not relevant.

The bases for and amounts of compensation paid to employees and outside consultants involved in plaintiff's benefit termination itself could prove relevant to plaintiff's claim. Certainly it could lead to other relevant evidence. It could matter a great deal, for example, if an outside reviewer derived all or most of his or her income from MetLife, particularly if that reviewer

Ex. F

frequently recommended denial or termination of benefits.

MetLife relies upon *Abromitis v. Continental Casualty Co.*[13] for the proposition that compensation of an outside consultant is not relevant where the consultant was not the decision-maker. But *Abromitis* is not helpful, particularly in light of *Glenn.* It rested in the first instance on the Fourth Circuit's pre-*Glenn* view that discovery was seldom permissible where the scope of review is the arbitrary and capricious standard. It then relied upon district court cases that concluded that where, as here, a conflict of interest is apparent on the record, discovery as to the extent of the conflict is inappropriate.

This view would not have been persuasive to this Court even before *Glenn.* The ultimate question in these cases is whether the decision in question was arbitrary and capricious. In making that determination, the existence, nature, extent, and effect of any conflict of interest are relevant considerations. A consultant may be compensated in a manner and/or to an extent that creates a motive to recommend against the payment of benefits because such recommendations are believed to serve the interests of the plan administrator. If a decision maker knowingly were to rely on advice from such a consultant, it would be only common sense to say that the decision would command less deference than one made on the basis of unbiased advice or in ignorance of the bias. The categorical or nearly categorical view of *Abromitis* and the cases upon which it relied – that discovery is seldom if ever permissible in these cases, at least if the existence of the conflict inherent in the plan administrator both determining claims and paying benefits is apparent on the record – thus is blind to potentially important information that, at least in some cases, may be critical to the

---

[13]

261 F. Supp. 2d 388 (W.D.N.C. 2003), *aff'd without consideration of the point,* 114 Fed. App'x. 57 (4th Cir. 2004).

Ex. F

8

fair and informed review of benefit claims.

Were there any doubt about this, *Glenn* removed it. It rejected special procedural or evidentiary rules and, in this Court's view, thus abrogated the limitations on discovery unique to ERISA cases that were imposed or applied by such cases as *Abromitis*. Moreover, it provided significant guidance for this case in its comments concerning the manner in which conflicts of interest are to be considered in such cases. It wrote:

> "In such instances, any one factor will act as a tiebreaker when the other factors are closely balanced, the degree of closeness necessary depending upon the tiebreaking factor's inherent or case-specific importance. The conflict of interest at issue here, for example, should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration. [Citation omitted] It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits."[14]

Thus, the Court made clear that not all conflicts are created equal. Their significance in any given case depends upon all of the circumstances, including those suggesting a higher or lower likelihood that the conflict affected the decision. Information bearing on the manner in which a conflicted plan administrator compensates outside consultants could be highly pertinent. Maintenance of compensation arrangements that create economic incentives for consultants to recommend denial or termination of benefits would have a material bearing on the likelihood that the administrator's conflict affects its benefit determinations.

---

[14]     *Glenn*, 128 S. Ct. at 2351.

*Ex. F*

9

3.     The Court has considered MetLife's other arguments.  Even if it were disposed to grant reconsideration, which it is not, it would conclude that they are without merit.

*Conclusion*

No one denies that speedy, simple, and inexpensive determination of actions seeking review of benefit determinations is desirable.  Eliminating or sharply limiting discovery would serve that goal.  But that is not the only goal.  Congress enacted ERISA to provide unsuccessful claimants with a federal forum for the fair determination of their claims.[15]  Pretrial discovery is a part of the process for which Congress opted.

This of course does not mean that limitless, pointless, and needlessly expensive discovery will be a part of every case seeking review of an ERISA benefit determination.  Far from it.  The Federal Rules of Civil Procedure presumptively limit depositions and interrogatories in all civil cases,[16] and they give district judges ample bases for imposing further limitations.[17]  But each case must be considered on its own merits.  Blunderbuss attempts to cut off discovery on the ground that it never or rarely should be permitted in these cases, whatever their merits before *Glenn*, no longer have merit.

---

[15]
> *See, e.g., Bird v. Shearson Lehman/Am. Express, Inc.*, 926 F.2d 116, 120 (2d Cir.) ("We are aware that one of the means by which Congress sought 'to protect ... participants in employee benefit plans and their beneficiaries' was 'by providing ... ready access to the Federal courts.'") (quoting 29 U.S.C. § 1001(b)), *cert. denied* 501 U.S. 1251 (1991).

[16]
> FED. R. CIV. P. 30(a)(2), 33(a)(1).

[17]
> *Id.* 26(b)(2)(A), 26(b)(2)(C), 26(c).

Ex. F

10

Defendants' motion for reconsideration [docket item 37] is denied in all respects. Even if reconsideration were granted, the Court would adhere to its original decision.

SO ORDERED.

Dated:        July 31, 2008

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)

Ex. F